UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

TORRI MCCRAY,

   Defendant.

17-CR-147
DECISION & ORDER

---

On February 27, 2019, the defendant, Torri McCray, pleaded guilty to possession with intent to distribute and distribution of fentanyl (Count 1) and 10 grams or more of butyryl fentanyl (Count 2). Docket Item 70. In the plea agreement, Docket Item 69, the government explicitly reserved its right to argue for an upward departure of McCray's Sentencing Guidelines calculation because a death or serious injury resulted from McCray's distribution of narcotics. *See* United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") §§ 5K2.1 and 5K2.2. This Court therefore conducted an evidentiary hearing on that issue on July 19, 2019. *See* Docket Item 82 (transcript). Post-hearing submissions from both sides were completed by December 9, 2019. *See* Docket Items 93, 97, 100.

The principal hearing witness was C.R., a confidential informant who purchased narcotics from McCray in several controlled buys. C.R. testified that on November 21, 2016, he and his best friend, D.S., purchased narcotics from McCray; that they both shared the narcotics that day; and that a few hours later, D.S. was found dead a few doors down from C.R.'s residence. The drugs purchased from McCray were the only drugs they possessed that day. The government also submitted an autopsy report and

other medical records, admitted into evidence without objection, concluding that D.S. had died as a result of "acute fentanyl intoxication." *See* Government Exhibits 1 and 2.

After hearing the evidence, reviewing the exhibits, and reading the submissions from both sides, this Court finds that the government has met its burden of proving by a preponderance of the evidence that the death of D.S. resulted from fentanyl distributed by the defendant. The Court therefore concludes that an upward adjustment of McCray's Guidelines calculation may be appropriate under Guidelines section 5K2.1.

## **FACTS**

D.S. died as a result of a fentanyl overdose on November 21, 2016. *See* Docket Item 82 ("Tr.") at 13-14 (admitting Government Hearing Exhibits 1 and 2 into evidence). Earlier that day, D.S. and C.R. had met with McCray and had paid him $60 for a half gram of heroin or fentanyl. *Id.* at 61-67. Those were the only drugs that C.R., and his friend D.S., had that day. *Id.* at 69. C.R. knew that D.S. did not have any other opioids in his possession because D.S. was suffering withdrawal symptoms when they purchased the drugs from McCray. *Id.* at 70.

C.R. and D.S. had been purchasing drugs from McCray for several months. *Id.* at 49, 54, 69, 191-92. C.R. also had another dealer from whom he would purchase drugs when McCray was unavailable, *id.* at 39-40, 191-92, but the last time he purchased drugs from the other dealer was at least a couple months before November 21, 2016, *id.* at 40.

When C.R. began purchasing drugs from McCray, he thought he was buying heroin; but when C.R. began drug testing and treatment, he tested positive for fentanyl.

*Id.* at 45-46. That surprised him, and he told McCray. *Id.* at 45-49, 51-53. McCray nevertheless insisted that he was selling heroin. *Id.* at 49, 55-56.

C.R., D.S., and D.S.'s wife purchased drugs as a group. *Id.* at 55. D.S. and his wife purchased drugs only with C.R., and only from McCray or the other dealer when McCray was not available. *Id.* at 54-55. When C.R. tested positive for fentanyl, D.S. and D.S.'s wife did as well. *Id.* at 53-54.

On November 21, 2016, D.S. and C.R. drove from Lockport, New York, to Buffalo to purchase drugs from McCray. *Id.* at 61-63. C.R.'s housemate drove the car; C.R. and D.S. were passengers. *Id.* at 63-64. On the way home, at about 2 p.m., they stopped at a coffee shop so that C.R. and D.S. could use the restroom to take some of the drugs. *Id.* at 73-77. When they arrived home, they took more. *Id.* at 79-81. The drugs they purchased from McCray were the only drugs they had that day. *Id.* at 80.

C.R. fell asleep; when he awoke, D.S. was gone and so was the bag of drugs. *Id.* at 82-87. Later, C.R. learned from the police that D.S. had died a few doors down from C.R.'s house. *Id.* at 95. The police also told C.R. that D.S. was found with a bag of drugs in his pocket—a bag of drugs that matched what they had purchased from McCray earlier that day. *Id.* at 109.

The next day, C.R. purchased more drugs from McCray. *Id.* at 115-16. When C.R. told McCray that D.S. had died the day before, McCray "showed remorse" and "seemed to be a little upset about it." *Id.* at 117. C.R. continued to buy drugs from McCray for another month or so—that is, until C.R. checked himself "into a detox facility." *Id.* at 133-34.

A few months later, C.R. and D.S.'s wife decided that they should do something about D.S.'s death, and C.R. therefore began to cooperate with law enforcement. *Id.* at 134-35. He was not given anything for his initial cooperation; however, he later was paid to make some controlled buys from McCray in June and July of 2017. *Id.* at 135-39.

At the hearing, C.R. was shown Exhibit 7, the bag of drugs recovered from D.S.'s pocket on the day D.S. died. *Id.* at 131-32. Per stipulation of the parties, the bag contained 0.07 grams of fentanyl and would have contained 0.08 grams before about 0.01 grams were tested. *Id.* at 198-99. C.R. testified that the bag of drugs looked like what he had purchased from McCray. *Id.* Although he could not say whether the amount of drugs in the bag was less than when he had last seen it, *id.* at 132, C.R. did recall that he and D.S. had used four doses of the 0.5 grams he had purchased from McCray and that about 3-4 doses would have been left. *Id.* at 195-96.

## **DISCUSSION**

Under Guidelines section 5K2.1, a court "may increase [a] sentence above the authorized guideline range" when "death resulted" from the relevant criminal conduct. Courts "use the preponderance of the evidence standard to determine whether death resulted." *Cordoboa-Murgas*, 233 F.3d 704, 710 (2d Cir. 2000). And circumstantial evidence may be sufficient to prove that "death resulted" from a defendant's distributing drugs.[1]

---

[1] *See, e.g.*, *United States v. Bunkley*, 732 Fed. App'x 388, 391-92 (6th Cir. 2018) (upholding district court's upward departure under section 5K2.1 where the defendant "admitted that he sold heroin to [the victim] on the day before the body was found[;] . . . the coroner later determined that [the victim] overdosed after ingesting heroin and two

But even when it is more likely than not that death resulted from the defendant's conduct, courts retain broad "discretion" to decide "whether to depart and if so, by how much." *Id.* In deciding whether to depart, courts consider factors like those used to distinguish culpability in a homicide, including "the defendant's state of mind and the degree of planning or preparation." U.S.S.G. § 5K2.1. And in deciding the appropriate level of increase, courts consider whether the death "was intended or knowingly risked[ ] and the extent to which the offense level for the offense of conviction . . . already

---

other drugs[; t]he police found [the victim] in the field by [the defendant's] home—the very same place [the victim] regularly went to immediately inject the drugs he purchased from [the defendant; a]nd [the victim] was still holding a used syringe [when the police found his body], indicating that he died right after injecting the drugs"); *United States v. Salyers*, 661 Fed. App'x 862, 866 (6th Cir. 2016) (upholding district court's upward departure under section 5K2.1 where the defendant "admitted giving heroin to [the victim] two days before he overdosed and "offered no evidence at trial that some other supplier was the source of the heroin that caused [the] fatal overdose"); *United States v. Nossan*, 647 F.3d 822, 826 (8th Cir. 2011) (upholding district court's upward departure under section 5K2.1 where "[t]he autopsy revealed the cause of [the victim's] death was due to heroin toxicity . . . [and t]he only drugs found in the [victim's] apartment where [he] overdosed were left over from the packages [the defendant] admittedly sent [in the mail]"); *United States v. Ihegworo*, 959 F.2d 26, 27, 29 (5th Cir. 1992) (upholding district court's upward departure under section 5K2.1 where the defendant sold heroin to an individual and "asked her to deliver [the heroin] to [the victim]"; the victim died "[t]hree or four hours after" receiving that heroin; law enforcement recovered heroin "in the victim's apartment" that was "ninety-three percent pure"; and "the next day" the defendant sold "ninety-seven percent pure" heroin—that is, "extraordinarily pure heroin" compared to the "13 percent to 20 percent" product typically sold on the street—to an informant and an undercover law enforcement officer); *United States v. Russow*, 2015 WL 1057513, at *1-*2, *3 (D. Conn. Mar. 10, 2015) (finding under section 5K2.1 that death resulted where text messages and video footage showed that the defendant sold a certain "brand" of heroin to the victim three hours before he was found dead with empty containers of that same "brand" next to his body and the autopsy report listed "acute heroin toxicity" as the cause of death, despite the fact that the victim had purchased heroin from another dealer three days prior to his death, because text messages showed that the victim had used all of the other dealer's heroin and had "sought unsuccessfully to obtain more," creating "[t]he inference" that the defendant did not "still ha[ve] a supply of heroin in his home" when he purchased the defendant's drugs).

5

reflects the risk of personal injury." *Id.* "The text of [section 5K2.1] . . . makes clear that intent is not required [at the first step], referring to whether 'death *resulted*' from the offense and directing courts to *then* consider for sentencing purposes 'the extent to which death or serious injury was intended or knowingly risked.'" *United States v. Russow*, 2015 WL 1057513, at *3 (D. Conn. Mar. 10, 2015) (second emphasis added) (quoting U.S.S.G. § 5K2.1)). In other words, "[t]he threshold determination depends only on the consequences of [the d]efendant's offense and his intent or lack thereof is considered as a mitigating or aggravating factor." *Id.*

So the question now before this Court is simply whether the government has proven by a preponderance of the evidence that D.S.'s death resulted from relevant conduct connected to McCray's offense. Stated another way, the Court will address only the threshold issue of whether death resulted from McCray's relevant conduct and reserve the latter issues for sentencing.

The hearing proof established that it indeed is more likely than not that D.S. died from an overdose of fentanyl supplied by McCray. First, there is little doubt that D.S. died from acute fentanyl intoxication. The autopsy report, stipulated into evidence, found exactly that. And it is beyond dispute that D.S. ingested fentanyl several times on the day he died.

Moreover, there is little doubt that the fentanyl was supplied by McCray. C.R. testified clearly and without hesitation that the only drugs he and D.S. had were purchased earlier that day from McCray. He knew that because they both were suffering the early stages of withdrawal; if they had already had other drugs, they would have taken them to alleviate their discomfort. In fact, McCray was the only supplier they

used for several months. And on the day of D.S.'s death, their back-up supplier was arrested and therefore not available. Tr. at 103-04, 149.

The defendant seems to suggest that because C.R. had fallen asleep when D.S. disappeared with the drugs, there is a chance that D.S. obtained other drugs before he died. But that speculation defies logic. If McCray was their primary supplier—in fact, their *only* supplier for the past month or two—and if their back-up supplier was incarcerated and unavailable, then where would D.S. have obtained drugs in the few hours that C.R. was sleeping? Even more basically, if D.S. had what was left from the drugs they had purchased earlier that day, **why** would he have gotten more?

What is more, the amount of fentanyl found in the bag after D.S.'s death is consistent with the conclusion that an overdose of those drugs caused D.S.'s death. C.R. testified that the 0.5 grams of fentanyl purchased from McCray would have yielded 5 to 10 doses—closer to 10 because the fentanyl was so potent. Tr. at 145. When pressed, he said that they had taken four doses and that three or four doses would have been left. *Id.* at 195-96. Doing the math, if four doses were taken and four were left from 0.5 grams, 0.25 grams would have remained; if four doses were taken and three were left, about 0.21 grams would have remained. The parties stipulated that 0.08 grams were in the bag found in D.S.'s pocket when he died. *Id.* at 199. So that means that *someone*—most likely D.S. since he had the drugs in his possession—used 0.13 to 0.17 grams (that is, about two doses or so) of the drugs. That is consistent with D.S.'s having died after overdosing on the drugs supplied by McCray earlier that day.

McCray argues that C.R.'s history of fraud, larceny, and drug convictions make him unworthy of belief. *See* Docket Item 97 at 14-16. Likewise, he suggests that C.R.'s

7

drug addiction and abuse make him incredible. *Id.* at 16-19. But C.R. had no reason to lie to implicate McCray. The defense offered no reason why C.R. might harbor ill will toward McCray, and C.R. received no benefit for volunteering to police that McCray had sold the drugs that killed his friend. Furthermore, C.R. impressed the Court as a credible, knowledgeable, and concerned witness. He did not waiver or hesitate; he showed no signs of confusion or doubt. On the other hand, he did not attempt to overstate what he knew. When asked, for example, whether what was now in the bag of drugs was less than what was in it when he saw it last, C.R. candidly said, "I can't answer that, it's been too long." Tr. at 132. In short, this Court has no reason to doubt C.R.'s credibility or recollection.

McCray also argues that allegedly supplying 0.5 grams of fentanyl to C.R. and D.S. in November 2016 was not "relevant conduct"[2] in connection with the crimes to which he pleaded guilty: possessing with intent to distribute and distributing larger quantities of fentanyl and butyryl fentanyl in June and July of 2017. Because of the gap in time between November 2016 and June 2017, and because the controlled buys were for amounts substantially larger than what he had allegedly been selling to C.R. and

---

[2] Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). To determine whether an act or omission qualifies as relevant conduct, courts consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required." *Id.* § 1B1.3(a)(2) cmt. 5(B)(ii); *see also United States v. Purchess*, 107 F.3d 1261, 1271 (7th Cir. 1997) (joining "[t]hree other circuits . . . [in holding] that a court may depart upward [under section 5K2.1]" based on harm resulting from relevant conduct" (citing *United States v. Sanders,* 982 F.2d 4 (1st Cir. 1992); *United States v. Figaro,* 935 F.2d 4 (1st Cir. 1991); *United States v. Kim,* 896 F.2d 678 (2d Cir. 1990), *holding limited by United States v. Contractor,* 926 F.2d 128 (2d Cir. 1991); *United States v. Shields,* 939 F.2d 780 (9th Cir. 1991)).

8

D.S., McCray argues, what occurred on November 21, 2016, was not part of the same course of conduct as the June and July 2017 drug sales. *See* Docket Item 97 at 10-13. More precisely, he says that unlike the small everyday sales to both C.R. and D.S. in 2016, the 2017 transactions (1) were "sporadic"—that is, "about every couple weeks"; (2) were initiated by law enforcement; (3) involved only C.R. with "C.R. being paid"; and (4) involved substantially greater quantities and substantially more money. *Id.* at 12-13.

In *Ihegworo*, the Fifth Circuit considered and persuasively rejected substantially the same arguments. The defendant in that case distributed "extraordinarily pure" heroin to an individual with instructions that she "deliver [the heroin] to [the eventual victim]." 959 F.2d at 27. "After learning of [the victim's] death, [the individual] called the police and reported her involvement in the incident. She then agreed to act as a confidential informant." *Id.* The next day, the individual, "accompanied by an undercover police officer[,] . . . purchased heroin from [the defendant]." *Id.* The Fifth Circuit rejected the defendant's argument that "section 5K2.1 [was] inapplicable as a matter of law because [the victim] was not the 'victim' of the offense of conviction"— namely, the controlled buy. *Id.* at 29. The court explained that section 5K1.2 requires only that there be "a nexus between the harm caused and the offense of conviction," not that "the harm . . . have been suffered by the victim of the instant offense." *Id.* at 30. "Having decided that the 'nexus' requirement does not include a 'victim-specific' component," the court upheld the district court's finding that "the [victim's] death . . . relate[ed] to the offense of conviction." *Id.* (citation omitted).

Here, while the timing and amounts may have been somewhat different, all the 2017 and 20176 transactions involved the sale of fentanyl (or a fentanyl analogue) by

9

McCray to C.R. for cash.  Indeed, the 2017 controlled buys were triggered by C.R.'s having reported to law enforcement that McCray supplied the drugs that killed D.S. McCray's sale of the fentanyl that resulted in D.S.'s death is therefore relevant conduct as to the instant offense.

## **CONCLUSION**

In sum, the government has proven by a preponderance of the evidence that McCray supplied the fentanyl that resulted in the death of D.S.  Moreover, that is relevant conduct in connection with McCray's pleas of guilty.  Therefore, this Court "may increase the sentence above the authorized Guidelines range" consistent with the death policy statement in Guidelines section 5K2.1.  In their sentencing submissions, the parties should address (a) "whether to depart" and (b) "if so, by how much."  *Cordoboa-Murgas*, 233 F.3d at 710.  In addressing these questions, the parties should discuss (a) McCray's "state of mind and the degree of planning or preparation" and (b) whether D.S.'s death "was intended or knowingly risked[ ] and the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury." U.S.S.G. § 5K2.1.

Sentencing is scheduled for 3/16/2020 at 9:30 a.m.  The Presentence Report is due to the parties due by 1/31/2020 and to the Court by 3/2/2020.  Sentencing Factors Statements/Sentencing Motions are due by 2/10/2020.  Objections/Responses to Sentencing Factors/Motions are due by 2/24/2020.  Character letters are due by

3/2/2020. Finally, any motions to adjourn are due by 3/6/2020. Failure to meet these deadlines may result in an adjournment of the sentencing.

SO ORDERED.

Dated: January 9, 2020
Buffalo, New York

*s/Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE